**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ORAYINKA ORAFIDIYA,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. :** |
| | : | |
| **v.** | : | **Date: March 28, 2025** |
| | : | |
| | : | |
| **LEWIS KATZ SCHOOL OF MEDICINE,** | : | |
| **TEMPLE UNIVERSITY,** | : | |
| **TEMPLE UNIVERSITY HEALTH** | : | |
| **SYSTEM, JOHN FRY, JASON WINGARD,** | : | |
| **GREGORY N. MANDEL,** | : | |
| **BARRY C. ARKLES,** | : | |
| **LEONARD BARRACK,** | : | |
| **STEPHEN G. CHARLES,** | : | |
| **ALAN M.COHEN, JOSEPH F. CORADINO,** | : | |
| **NELSON A. DIAZ, FAY MARIE DUNBAR,** | : | |
| **PATRICK J. EIDING,** | : | |
| **JUDITH A. FELGOISE,** | : | |
| **LON R. GREENBERG, TAMRON HALL,** | : | |
| **KELLYN HODGES, MARINA KATS,** | : | |
| **DREW A. KATZ, SUSANNA LACHS,** | : | |
| **PATRICK V. LARKIN,** | : | |
| **AMY LAROVERE, SOLOMON C. LUO,** | : | |
| **JOSEPH W. MARSHALL, III,** | : | |
| **ANTHONY J. MCINTYRE,** | : | |
| **LESLIE ANNE MILLER,** | : | |
| **MITCHELL L. MORGAN,** | : | |
| **LEON O. MOULDER, JR.,** | : | |
| **BRET S. PERKINS, PEDRO RAMOS,** | : | |
| **MICHAEL H. REED,** | : | |
| **PHILLIP C. RICHARDS,** | : | |
| **CHARLES E. RYAN, JANE SCACCETTI,** | : | |
| **KENNETH SCOTT, LAURA SPARKS,** | : | |
| **ROBERT S. TAYLOR,** | : | |
| **CHRISTINE M. TARTAGLIONE,** | : | |
| **TIFFANY A. WILSON,** | : | |
| **AMY J. GOLDBERG, M.D.,** | : | |
| **MARYELLEN GUSIC, M.D.,** | : | |
| **DIONE J. CASH, M.D.,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Orayinka Orafidiya, and as against Defendants brings this action for the violation of her civil rights, rights under the Pennsylvania Human Relations Act, and rights under common law of the Commonwealth of Pennsylvania, due to Defendants' discrimination against her on the basis of disability status, race, sexual orientation, age, and retaliation against her for her involvement in protected activity.

## THE PARTIES

1. Plaintiff Orayinka Orafidiya ("Orafidiya") is an adult resident of the city of Philadelphia, and at all times relevant to this Complaint, Orafidiya was a medical student at Defendant Lewis Katz School of Medicine ("LKSOM"), the medical school of Temple University ("Temple").

2. On October 13, 2015, Temple's medical school was officially dedicated as the Lewis Katz School of Medicine. LKSOM has achieved a national reputation for training humanistic clinicians and biomedical scientists. Its stated Mission is to align with diverse communities to advance medicine and improve health through education, research, training, and development of the next generation of clinicians, educators, and scientists. Its stated Vision is to inspire a new standard of excellence in education and research and lead social change in medicine. Its educational strategic plan, "Improving Health Through Innovation in Medical Education," keeps pace with new medical knowledge and with emerging trends in care delivery. LKSOM boasts the Wellness Initiative to identify and enhance high-impact support functions for students, faculty, and staff, among which are counseling, childcare and facilities. The school attracts students and faculty committed to making a difference in patient care, research, education, and public service.

3. LKSOM enjoys an education and research building that features state-of-the-art facilities and technologies for medical education and research. LKSOM is part of Temple University Health System ("Temple Health"), a $1.6 billion enterprise.

4. Upon information and belief, Temple is a public institution of higher education, chartered by the Pennsylvania Legislature in 1888 as Temple College. Temple is governed by a Board of Trustees, and is a top research institution with over 30,000 undergraduate, graduate and professional students. It represents that it prioritizes accessible education and innovation in higher education, groundbreaking research, and celebrates a vibrant community of students, faculty, and staff. Temple prides itself on the creation of a collaborative community of outstanding faculty and staff who foster inclusion and encourage the aspirations of Temple students. Temple represents that it offers students a dynamic and nurturing learning environment with the support of a renowned faculty and dedicated academic advisors. Temple is also among the nation's largest educators in the combined fields of dentistry, law, medicine, pharmacy, and podiatry. Temple receives federal funding.

5. The Trustees of Temple University ("Trustee Defendants") have ultimate responsibility for the supervision of Temple and its administrators, faculty, and staff; the Trustee Defendants have the ultimate responsibility to ensure that Temple's rules, policies, and procedures are faithfully followed and that Temple adheres to the law. On information and belief, the Trustee Defendants, *exclusive* of "Honorary Life Trustees," "Ex-Officio, Non-Voting Trustees," and "Non-Voting Representatives," are identified by name, as follows: Barry C. Arkles, Leonard Barrack, Stephen G. Charles, Alan M. Cohen, Joseph F. Coradino, Nelson A. Diaz, Fay Marie Dunbar, Patrick J. Eiding, Judith

A. Felgoise, Lon R. Greenberg, Tamron Hall, Kellyn Hodges, Marina Kats, Drew A. Katz, Susanna Lachs, Patrick V. Larkin, Amy Larovere, Solomon C. Luo, Joseph W. Marshall, III, Anthony J. Mcintyre, Leslie Anne Miller, Mitchell L. Morgan, Leon O. Moulder, Jr., Bret S. Perkins, Pedro Ramos, Michael H. Reed, Phillip C. Richards, Charles E. Ryan, Jane Scaccetti, Kenneth Scott, Laura Sparks, Robert S. Taylor, Christine M. Tartaglione, and Tiffany A. Wilson. The Trustee Defendants are sued in their official capacities only.

6. Upon information and belief, Temple Health is a major Philadelphia-based academic health system that is reputed to drive medical advances through clinical innovation, pioneering research, and world-class education. Temple Health, with its 1,749 physicians and 350+ researchers, is an educational partner with Defendant LKSOM, providing medical education to the next generation of physicians and biomedical scientists.

7. Upon information and belief, Defendant John Fry ("Fry") is the newly-appointed President of Temple. Defendant Jason Wingard ("Wingard") served as President of Temple and held ultimate authority for the supervision of all Temple administrators, faculty, and staff. Defendant Gregory N. Mandel ("Mandel") is the Senior Vice President and Provost of Temple. In 2022, Mr. Mandel was instrumental in launching the university-wide Task Force on Mental Health and Wellness, under President Wingard's leadership, in response to the COVID-19 pandemic.

8. Upon information and belief, Defendant Amy J. Goldberg, M.D., FACS ("Goldberg") is Dean of LKSOM. The President of the University appoints the Dean of LKSOM. The Dean of LKSOM shall report to and be accountable to the President or

his/her designee, such as the Provost, and shall serve at the pleasure of the President. The Dean is responsible for supervising LKSOM's administration, and appoints Vice Deans, Senior Associate Deans, Associate Deans, Assistant Deans, Department Chairs, Center/Institute Directors, and other academic and administrative personnel to assist in those administrative activities. Defendant Maryellen Gusic, M.D. ("Gusic") is Senior Associate Dean of Education for LKSOM. Defendant Dione Cash, M.D., MPH (Cash") is Associate Dean of Student Support for LKSOM.

9. As regards the actions and conduct that have resulted in damages to Orafidiya detailed herein, Defendants LKSOM, Temple, and Temple Health and the individual Defendants were agents of one another, and joint venturers with a common goal of removing Orafidiya from the medical school, with each Defendant acting for all others, and all Defendants liable for the wrongful acts of any one of the others.

**JURISDICTION AND VENUE**

10. This action arises under the laws of the United States, under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 12182 (a), 42 U.S.C. § 12132, 29 U.S.C. § 794, 42 U.S.C. 12203(a), 42 U.S.C. §§ 1983 and 1988, Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq., 42 U.S.C. § 1981, and 29 U.S.C. §§ 621-634. This Court has original jurisdiction over these claims under 8 U.S.C. § 1329 and 28 U.S.C. § 1343.

11. This Court has the authority to award the requested damages under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. § 2201-02; and costs and attorneys' fees under 29 U.S.C. § 794 and 42 U.S.C. § 1988.

12. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

13. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants are deemed to reside in the district in which their contacts would be sufficient to establish personal jurisdiction if this district were a separate State, and the acts described in this Complaint occurred in this district.

**FACTS**

14. Orafidiya is a nontraditional medical student in that at the time of her enrollment at LKSOM, she was 39 years old, and identified as a queer, Black woman with a disability. These are protected classifications under the laws prohibiting discrimination in institutions of higher learning.

15. Orafidiya has an extensive history of hard work and achievement. She completed her secondary education at the William Penn Charter School. She graduated from the University of Pennsylvania with a dual degree in chemical engineering and mathematics.

16. Orafidiya spent thirteen (13) years working as an engineer in the pharmaceutical industry, with distinction.

17. Realizing the need for her skills in the community that produced her, Orafidiya decided to pursue medicine as a career and, foundational to that choice, enrolled as a continuing studies student at Temple to earn post-baccalaureate credits in support of her application to medical school. Those credits, all courses in the hard sciences, resulted in a 4.0 GPA.

18. At Temple, there is a disability letter for Orafidiya on file with the Disability Resources & Services Office, the utilization of which resulted in outstanding

performance, as Orafidiya earned post-baccalaureate credits with excellence. Through Orafidiya's application process and during her enrollment at LKSOM, LKSOM was well-notified of Orafidiya's disability status and the accompanying need for accommodations.

19. Orafidiya began her coursework at LKSOM in August 2019 and completed Blocks 1 and 2 of the medical school curricula, passing both courses. She began Block 3 in January 2020, but halfway through the block, her mother had a massive stroke. Orafidiya was her mother's primary caregiver, a fact that she made abundantly clear in her medical school application. Orafidiya had a passing grade of 76% in Block 3.

20. During the nascent development of the COVID-19 pandemic in early 2020, Orafidiya was unable to obtain PPE to allow healthcare workers into her home. Contemporaneous with these personal events involving Orafidiya in 2020, LKSOM and Temple at large began large-scale use of technology to continue doing business in the presence of COVID-19. This technology allowed students to perform study and academic requirements by remote electronic means.

21. It is indisputable that at all times relevant to Orafidiya's enrollment, LKSOM offered courses related to applications, licensing, certification, or credentialing for professional purposes, as here, the field of medicine. LKSOM's responsibilities for and actions toward its students are subject to the Americans with Disabilities Act. Under the ADA, LKSOM, through its administrators, was *required by law* to offer its courses in a place and manner accessible to persons with disabilities. In addition, LKSOM was *required by law* to make such *modifications* to its courses as necessary to ensure that the place and manner in which the courses are given are accessible to individuals with disabilities.

22. It was well known to LKSOM administrators and Temple that notwithstanding her history of high academic achievement, Orafidiya suffers from a mental health impairment, disabling anxiety and depression, that affects her performance. Orafidiya's disability restricts her in major life activities such as caring for herself, sleeping, reading, writing, learning and working. LKSOM was therefore required by law to grant reasonable accommodations for Orafidiya's mental health support, including extra time for exams, a flexible attendance policy, and the ability to receive alternative due dates and make-up exams LKSOM did not provide these supports as reasonably requested by Orafidiya. Had LKSOM complied with its legal obligation, Orafidiya would be an enrolled student in good standing. Instead, the institution, through its administrators, imposed its own conditions, pretextual as accommodating Orafidiya's requests, while in fact retaliating against her and setting the stage for Orafidiya's constructive dismissal, or the involuntary dismissal and consequential injuries and damages that ultimately occurred.

23. Due to her mother's declining health, Orafidiya requested and was granted approval to change her enrollment classification to Independent Student Status ("ISS") for the Spring 2020 and Fall 2020 semesters. The plan was that Orafidiya would return to school in January 2021 and matriculate with the Class of 2024. Orafidiya requested, and obtained, approval to become a member of the LKSOM class of 2024.

24. Orafidiya's mother contracted COVID-19, became critically ill, and on December 15, 2020, died in Orafidiya's home. These events left Orafidiya in a fragile mental state, including anxiety, depression and the onset of PTSD, information that she shared with medical school administrators.

25. On February 2, 2021, Orafidiya met with Dr. Gerald Sterling, Senior Associate Dean of Education, and Dr. Douglas Reifler, Associate Dean for Student Affairs, to discuss her return. They agreed that Orafidiya would return in November 2021 to join the class of 2025. She accepted the recommendation to remain in ISS for Fall 2021, yet be allowed to take Fundamentals 3 and join Doctoring I in November 2021. Orafidiya agreed to become a member of the class of 2025. The architect of this agreement, Dr. Sterling, retired just before Orafidiya returned for enrollment in Fall 2021.

26. LKSOM, through its subsequent administrators, breached the terms of this agreement.

27. The initial breach occurred when Orafidiya contacted the newly-installed Senior Associate Dean of Education, Defendant Gusic, to explain that she was a student in crisis returning from an extended leave and in need of support and reasonable accommodations with transitioning back to school. *There is no indication that Gusic consulted with Dr. Sterling to confirm the accommodations in place that governed Orafidiya's return to school. Gusic also had no objective basis to refute Orafidiya's contention that her attendance issues were directly related to mental health episodes and protracted grief related to her mother's death during the pandemic*. Orafidiya's requested accommodation was that she be allowed to cover in-person group sessions virtually, just as remote participation had been used during the pandemic months earlier. The request was denied. Rather than provide support and reasonable accommodations, Gusic exacerbated the symptoms of Orafidiya's disability. Given the information available concerning Orafidiya's history, Gusic's misconduct was intentional.

28. In a direct *punitive* response, Gusic referred Orafidiya for *disciplinary* action by the Academic Standards & Promotions Committee (ASPC). Gusic's stated rationale for this action was that Orafidiya had missed the Class of 2025 orientation and other in-person group sessions in November 2021, neither of which was a condition of the plan previously established and agreed to by LKSOM administrators.

29. There was no discussion during the meeting of February 2, 2021, much less agreement, that Orafidiya be required to attend the Class of 2025 orientation in August 2021, or that she be required to *restart* the Doctoring I curriculum. Indeed, when Dr. Sterling was contacted by Orafidiya for clarification of his expectations concerning Orafidiya's return, Dr. Sterling confirmed that he *had no expectation* that Orafidiya would be attending orientation in August 2021. Gusic was not involved with formulation of the plan for Orafidiya's return to in the Fall 2021, but as successor to the office of Senior Associate Dean of Education that constructed the agreement governing Orafidiya's return, Gusic was bound to adhere to its terms and conditions. Further, Gusic knew, or in the exercise of reasonable diligence should have known, of Orafidiya's recent personal struggles with providing care for her mother, her unresolved grief, her history of mental health disability, and her documented legal entitlement to reasonable accommodations.

30. With an unexplained and grossly apparent animus towards Orafidiya, Gusic expressed *her personal preference* that Orafidiya withdraw from school. When Orafidiya refused to withdraw, Gusic and LKSOM administrators undertook a series of actions to render the medical school environment hostile and unbearable, and to retaliate against Orafidiya as she transitioned back to medical school. The ASPC decision letter prepared

by Gusic contained an extremely detailed list of requirements upon which Orafidiya's eligibility to continue in medical school would be measured. The threat of severe consequence is retaliation, a violation of Orafidiya's right to request and receive reasonable accommodations (protected activity) as she transitioned back to medical school.

31. The specificity of conditions in Gusic's letter made evident that regardless of Orafidiya's future need for support in confronting challenges transitioning back to school, she would be referred back to ASPC for *disciplinary* action. This cumulative response and threat of severe consequence is retaliation, a violation of Orafidiya's right to request and receive reasonable accommodations as she transitioned back to medical school. The injury to Orafidiya caused by the retaliation was compounded by the fact that Orafidiya was in no position to bargain and could not adequately defend or advocate for herself, a circumstance that was clear and recognized by LKSOM administrators. Orafidiya was not "heard" by the administration in a setting where hearing from the disabled grievant is fundamental.

32. The blatant inequality in bargaining positions in light of the risk to Orafidiya in losing a substantial right gave rise to a duty for LKSOM to provide Orafidiya with a supporting structure so that she could adequately advocate for herself and make fully informed choices concerning LKSOM terms and conditions. The elements of that structure, namely a team of personnel with the expertise and personal knowledge to address Orafidiya's unique needs, were already available. Dr. Gerald Sterling, who had previously advised Orafidiya on return to school preparation. Dr. Bettina Buttaro, the course director of Fundamentals 3, who had worked with Orafidiya to provide an outline

of the key concepts that she needed to study. Dr. Melanie Cosby, an advocate from the Office of Health, Equity, Diversity, and Inclusion, who had served as a temporary communications liaison between Orafidiya and the LKSOM administration and had accompanied Orafidiya to an in-person meeting with the administration. None of these individuals were consulted, individually or collectively, to establish a plan that would give Orafidiya the best chance of success. This failure breached the duty of care owed to Orafidiya.

33. Although Orafidiya had developed a support team of medical school administrators for guidance in her transition back to medical school, Gusic and LKSOM administrators consulted with none of these individuals, individually or collectively, to confirm or alternatively establish a plan that would give Orafidiya the best chance of success. LKSOM's failure to perform an individualized inquiry as to Orafidiya's mental disability, and failure to weigh the options to accommodate it, violated the duty of care owed to Orafidiya.

34. Given the denial of accommodations and lack of a supportive environment, Orafidiya had no alternative except to acquiesce to the terms presented by Gusic. The denial of requested accommodations and retaliation were violations of law at all levels. The failure to hear from Orafidiya with proper support and advocacy renders the purported hearing and findings by ASPC a nullity, and as such, is a violation of the university's policy.

35. Nevertheless, Orafidiya had no choice but to try to comply with Gusic's requirements as set forth in the notification communication dated December 17, 2021. This acceptance formed a valid contract between the parties. As LKSOM, through

ASPC, unilaterally dictated the terms, LKSOM's compliance was essential. Under those terms, Orafidiya was to remediate Fundamentals 3 after the winter break (January 2022) and remediate Fundamentals 4 on Monday, July 11, 2022, at 9 a.m.

36. LKSOM further breached the terms it had established by failing, through the Office of Student Support, to arrange the Fundamentals 3 remediation exam according to the ASPC timeline. LKSOM administration assigned Orafidiya an "Incomplete" for each block, Fundamentals 3 and Fundamentals 4, for a total of two (2) incompletes, pending Orafidiya passing a joint remediation examination in the summer. Orafidiya expressed alarm that the new plan differed from the agreement reached under the controlling ASPC letter by which the parties were bound (protected activity). She was ignored. The failure to hear from Orafidiya with proper support and advocacy renders the purported hearing and findings by ASPC a nullity, and as such, a violation of the university's policy.

37. These hostile actions, in light of an agreement already reached between Orafidiya and LKSOM but inexplicably ignored by Gusic and other LKSOM administrators, could only be explained by animosity toward Orafidiya, retaliation, or unconstitutional bias. The actions of LKSOM administrators violated the anti-discrimination laws and occurred because of Orafidiya's protected attributes as a queer Black woman with a disability. The discrimination and retaliation would persist for the duration of Orafidiya's time at LKSOM. Further evidence of hostility toward Orafidiya was evident in the failure of LKSOM administrators to apprise Orafidiya of the potentially catastrophic consequence of the remedy ultimately chosen by them, namely, to require that Orafidiya continue the Fundamentals 3 exam for 7 months and receive an "Incomplete" in the interim. Orafidiya was actually prepared to take the Fundamentals 3 exam in January 2022.

38. LKSOM breached the terms it had established by failing, through the Office of Student Support, to arrange the Fundamentals 3 remediation exam according to the ASPC timeline. Administrators were well aware that Orafidiya had been in intense preparation for the exam and had been threatened with disciplinary action in the event of poor performance. Yet, the responsible administrators failed to notify Orafidiya that they could not construct the exam at all, in breach of the agreement terms of their own construction. They even failed to schedule the examination and never sought Orafidiya's consent to modify the terms of the agreement regarding the test date. Orafidiya was prepared to take the remediation examination for Fundamentals 3 at the time specified for its administration.

39. Worse still, rather than admit fault in failing to prepare Orafidiya's remediation exam as required, LKSOM administrators declared that it would be *in Orafidiya's best interest* to postpone the Fundamentals 3 remediation exam until the summer. Orafidiya was told that a merged Fundamentals 3 and 4 remediation exam would be prepared, approximately 1.5 times the length of a normal remediation exam. When Orafidiya expressed alarm that this plan differed from the agreement reached under the controlling ASPC letter by which the parties were bound (protected activity), LKSOM administrators were dismissive. They assured Orafidiya that there was no reason for any concern.

40. Here, again, LKSOM administrators took advantage of their superior bargaining position. Under the threat of disciplinary action, LKSOM required that Orafidiya be prepared for a remediation examination. Shouldering that pressure, Orafidiya did prepare and was set to take the examination, only to learn, by serendipity and not by advance notice, that the examination was unavailable. In absolutely no position to properly

advocate for herself, Orafidiya capitulated. The administration assigned her an "Incomplete" for each block, Fundamentals 3 and Fundamentals 4, for a total of two (2) incompletes, pending Orafidiya passing the joint remediation examination in the summer.

41. This was egregious and actionable misconduct by LKSOM in multiple ways. First, LKSOM administrators persistently failed to support Orafidiya's mental health condition and operated as if she had no rights as a disabled person. Rather than maintain its duty to support Orafidiya with conduct and services accommodating her unique needs, LKSOM exacerbated Orafidiya's trauma by treating her as if those needs did not exist.

42. Second, the exam schedule mandated by ASPC and affirmed by Gusic was abandoned by LKSOM administrators without prior notice to Orafidiya. LKSOM administrators had actual knowledge of the hard work that Orafidiya performed under the duress of disciplinary action, and knew that Orafidiya was ready for the examination, yet LKSOM failed to move with the urgency that ASPC conditions commanded. The Office of Student Support failed to arrange the exam even though Orafidiya was prepared to take it. Rather than acknowledge its error and properly seek a minor modification of the ASPC conditions, that is, continuing the exam for only so long as required for its creation, LKSOM administrators concealed the error and delayed the examination for 7 months.

43. Third, while LKSOM utilized its policy, the ASPC hearing, to threaten Orafidiya with academic discipline, LKSOM did not utilize that same policy to timely set a new Fundamentals 3 examination schedule favorable to Orafidiya's academic performance. The make-up examination should have been scheduled for an alternative date in January or February while Orafidiya's preparation was fresh.

44. Fourth, LKSOM administrators took advantage of Orafidiya's inferior bargaining position to force a remedy, the 7-month continuation of the examination, that LKSOM administrators should have known would be detrimental to Orafidiya's academic interests, then intentionally falsified the justification for that remedy by *misrepresenting* Orafidiya's position. The surreptitious contention that Orafidiya *requested herself* that the Fundamentals 3 examination be postponed was a misrepresentation of a material fact by Cash. Cash embellished the coverup by also contending, falsely, that Orafidiya lacked professionalism and was not prepared for the exam. There are no facts to support either contention.

45. Finally, LKSOM administrators failed to foresee, appreciate, account for, and apprise Orafidiya of the potentially catastrophic consequence of the remedy it chose, namely, to continue the Fundamentals 3 exam for 7 months and impose an "Incomplete" in the interim. Under such circumstances, Orafidiya could not make an informed choice. Alternatively, LKSOM administrators recognized that the plan was doomed from its inception, its purpose to force Orafidiya to withdraw or establish grounds supporting involuntary dismissal.

46. In January 2022, Orafidiya's father's health deteriorated to such a degree that he could no longer live alone. Orafidiya's father moved in with her. Orafidiya started Systems 1 on January 24, 2022, under the ASPC requirements. She studied well at home for Systems 1, but with her father living in her home, Orafidiya struggled to balance her caregiving obligations with attending small group sessions in person at school. The accumulated pressures catalyzed a progressing mental health crisis, prompting Orafidiya to request a reasonable accommodation to participate virtually in small group discussion

("SGD") sessions by Zoom, a technology vastly utilized by LKSOM and Temple during the COVID-19 pandemic. This request was denied by Gusic and Cash, and forced Orafidiya to miss multiple SGD sessions. Participation in small group discussions virtually over Zoom was already an established alternative available to students quarantined with COVID-19.

47. On February 18, 2022, Orafidiya shared with Gusic and Cash that her father was very ill and had moved into her home. These LKSOM administrators denied the request for an accommodation, effectively sealing Orafidiya's fate: they denied the requested accommodation and declared their joint opinion that Orafidiya should withdraw from LKSOM, understanding that without the requested accommodation, Orafidiya would become academically ineligible to continue. As a result of the denial of the accommodation and Orafidiya's continuing obligation to care for her father without the benefit of the reasonable modification to attend SGD sessions by Zoom, Orafidiya missed multiple SGD sessions.

48. Orafidiya did not pass the first two midterms for Systems 1. This accelerated the unfortunate cycle of Orafidiya requesting reasonable accommodations to relieve her mental health symptoms, LKSOM administrators denying those requests and moving instead with threats of academic discipline, thus exacerbating Orafidiya's mental health symptoms.

49. LKSOM administrators never allowed Orafidiya's requested accommodations to work, and instead imposed their authority rather than make legitimate medical or psychological inquiries as to the most effective means to relieve Orafidiya's mental health symptoms.

50. On March 15, 2022, Orafidiya was summoned again to meet with Gusic and Cash. She requested accommodations and none were granted. Rather than address the reasonableness of the requested accommodations, Gusic again informed Orafidiya of her "option" to withdraw from medical school and declared her intention to take Orafidiya before ASPC on March 22, 2022. When Orafidiya expressed her alarm that the ASPC hearing was only three (3) days before the scheduled Systems 1 final exam (protected activity), a fact well-known to Gusic, Gusic stated without empathy that given Orafidiya's midterm scores, it was mathematically impossible for Orafidiya to pass the Block and that there was no point to Orafidiya taking the Systems 1 final exam at all. Gusic's actions, lack of empathy, and demonstrated failure to address whether a grant of reasonable mental health accommodations would facilitate Orafidiya's success, revealed her discriminatory bias and her intent to elicit Orafidiya's withdrawal from LKSOM or establish grounds for her involuntary dismissal.

51. The reasonable inference to be drawn from this resistance to accommodate Orafidiya with necessary support is that there was a concerted effort by the administration to elicit Orafidiya's withdrawal from LKSOM or establish grounds for her involuntary dismissal. Indeed, Gusic and Cash were very clear about *their* preference that Orafidiya withdraw from school. When Orafidiya refused to withdraw (protected activity) act, LKSOM administrators undertook a series of actions to render the medical school environment hostile and unbearable.

52. In April 2022, Cash revealed that she and Gusic had met with then Interim Dean Amy Goldberg to discuss Orafidiya's academic progress at LKSOM and the "options" that would be made available to her. The discussions occurred without any knowledge or

input from Orafidiya. Cash called a meeting with Orafidiya. Given the demonstrated bias against her evident from LKSOM administrators' serial denials of her requests for reasonable accommodations, Orafidiya requested to bring a support person to the meeting and enlisted the help of an advocate from the Office of Health, Equity, Diversity, and Inclusion, Dr. Melanie Cosby.

53. On May 12, 2022, Dr. Cosby accompanied Orafidiya to the in-person meeting with Cash. Even though Orafidiya had failed both Systems 1 and Systems 2, no academic coaching was offered, nor were any accommodations entertained. Instead, Cash provided Orafidiya with a hard copy document that presented two options only: (1) withdrawal; and (2) leave of absence. The presentation of these options shocked Orafidiya not only because they were not remedial, but also because Cash knew or should have known that the potential consequences were so dire that Orafidiya's acceptance would be self-inflicted harm.

54. To wit: were Orafidiya to pursue these options based upon the language contained in the document provided by Cash, LKSOM would include on Orafidiya's Medical Student Performance Evaluation (MSPE) letter [a document required to obtain a post-graduation residency position], that she had been "unprofessional" during her time as a medical student. Shocked by even the suggestion of unprofessional behavior and the request for her signed admission of it, Orafidiya asked how her grief response to her mother's death and her provision of health care for her father's life-threatening and eventual terminal illness during the relevant period translated into "unprofessional" behavior (protected activity). Cash gave no explanation. During the relevant time period, Orafidiya was not on academic probation, had not received any document from

LKSOM declaring specific conduct as "unprofessional," and had not received any document from the promotions committee that included comments on or remediation for "unprofessional" behavior. Notwithstanding LKSOM's access to medical and mental health professionals, and access to Orafidiya for a behavioral assessment, the allegations of "unprofessional" behavior were unfounded and further evidence of bias by LKSOM through its agent administrators.

55. Given the conditions attached to the options of withdrawal from LKSOM or take a leave of absence, Orafidiya had no choice but to respectfully decline both options. Stated simply, absent evidence to the contrary, Orafidiya was confident in her judgment that agreeing to either of those options would end her medical career or, at minimum render unlikely the prospect of her securing a residency position post-graduation. When Orafidiya expressed this concern to Cash (protected activity), Cash was cavalier in her assessment, asserting that the MSPE was not as important as medical students construed it. Other medical professionals Orafidiya consulted on the matter were unanimous in their disagreement with Cash's assessment.

56. Further, the statement that Orafidiya had been "unprofessional" during her time as a medical student was defamatory as it was false when made, and Cash and other LKSOM administrators knew of the statement's falsity. The statement caused Orafidiya to enter a mental health crisis of anxiety and depression. It was also a veiled threat, warning Orafidiya of professional risk if she failed to comply with the directives of LKSOM administrators. These actions, the defamation and the threat of professional injury, were retaliatory.

57. In the absence of plausible options, Orafidiya had no choice but to continue into Systems 3. During Systems 3, Orafidiya continued to miss a substantial number of the in-person small group discussions because she was the in-home healthcare provider for her ailing father ***and*** the medical school administration refused to allow her to participate in some sessions virtually. At one point Cash even mentioned how hiring a private nurse might help alleviate Orafidiya's responsibilities at home, unwelcome commentary that was at minimum class-biased as Cash ultimately admitted, given her awareness that Orafidiya did not have the resources to hire a private nurse.

58. Notwithstanding the obstacles of caregiving responsibilities and the intransigence of medical school administrators confronting her, *Orafidiya was within reach of passing the Block on the Systems 3 final exam*. Orafidiya sought and obtained the assistance of the course director, Dr. Rebecca Sullivan, with positive results. Dr. Sullivan demonstrated tremendous compassion for Orafidiya's unique circumstances and helped Orafidiya lay out a study plan and reinforce the high-yield concepts.

59. Inexplicable except for personal animus, Gusic intervened. Rather than allow Orafidiya the opportunity to score her best on the Systems 3 final exam and pass the Block without intrusion, distraction, or compromise to her mental health, Gusic determined it necessary to inform Orafidiya, *on the eve of* the Systems 3 final exam, of Gusic's intention to have Orafidiya disciplined by the Promotions Committee *following* the Systems 3 final exam. Gusic knew or should have known that the threat of disciplinary action would impair Orafidiya's examination performance. This action by Gusic was detrimental to Orafidiya's best performance and triggered Orafidiya into an episode of anxiety and depression. Gusic's notice was unnecessary, intentional, and in

reckless disregard for the mental health crisis that it caused Orafidiya leading to the exam. This threat was unnecessary and retaliatory.

60. In the early morning of June 3, 2022, ***the same day*** as the Systems 3 final exam, Orafidiya's father passed away in her home. She did not sit for the final exam that day. Orafidiya promptly shared the news of her father's death with Dr. Cosby and asked if Dr, Cosby could communicate the information to Cash and Gusic. Given the trauma experienced at home and inflicted by medical school administrators, Orafidiya also asked that Dr. Cosby serve as a temporary communications liaison between her and the administration, as prior interactions with them had been energy-draining and triggering of mental health episodes. Orafidiya focused on processing the loss of her father and making his final arrangements.

61. Following the burial of her father, Orafidiya confronted a series of inexplicable denials of her requests to move her case forward. She requested a date and time to make up the Systems 3 final exam that she missed the day her father died. She also requested that she be allowed to take the Fundamentals 3 and 4 exams, consistent with the requirements of the ASPC decision letter dated December 17, 2021. Gusic denied these requests. Orafidiya requested that she be allowed to take the remediation exams as soon as possible. Gusic denied the request without explanation. Gusic's unwarranted denials of Orafidiya's requests for reasonable accommodations were discriminatory, retaliatory, and not otherwise explained.

62. Similarly, in anticipation of the next Medical Student Learning Environment and Appeals Committee ("SLEAC") meeting already scheduled to take place on July 1, 2022, Orafidiya requested that she be allowed to present her case at that meeting (protected

activity). Cash failed to heed Orafidiya's pleas for urgency and refused to add Orafidiya's case to the SLEAC agenda for that date.

63. Orafidiya was not allowed to take make-up exams or to present her case to SLEAC. This was valuable time wasted. The Promotions Committee did not meet until July 12, 2022. On July 14, 2022, Orafidiya received Gusic's ASPC decision letter. On July 18, 2022, Orafidiya notified Cash of her intention to appeal Gusic's ASPC decision letter. On July 25, 2022, A SLEAC meeting was convened to hear her appeal.

64. Orafidiya requested a meeting to speak with Goldberg before she rendered her final decision. The meeting was scheduled for August 2, 2022. On the day before the meeting with Goldberg was to occur, August 1, 2022, Orafidiya received a telephone call from Cash directing her to report for orientation as a requirement for completion of the First year curriculum. Orafidiya explained to Cash that she had not yet exhausted her challenge to the ASPC decision letter dated July 14, 2022, (protected activity) and that she had yet to receive a final determination from Goldberg.

65. Orafidiya did not want her presence at orientation to be misconstrued as a firm decision to withdraw her appeal and join the Class 2026 under the terms & conditions set forth in Gusic's ASPC decision letter dated July 14, 2022. Following the telephone conversation with Cash, and on the same date, Orafidiya received the decision letter from Goldberg, reiterating the exact same conditions that were set forth in the ASPC decision letter written by Gusic, dated July 14, 2022 (protected activity). Effectively, Goldberg reneged on her agreement to meet with Orafidiya before rendering her final decision.

66. On August 2, 2022, Orafidiya met with Goldberg as planned to inquire about the rationale behind Goldberg's decision and to answer any outstanding questions she might have. At the request of Goldberg, Cash was also in attendance at this meeting.

67. It had never been Orafidiya's choice to "join" or "sit for exams" as a member of the Class of 2026. In truth, joining the Class of 2026 was the only option available to Orafidiya after Gusic inexplicably denied her the opportunity to sit for M1 remediation and makeup exams in Summer 2022. Gusic's denial was without a meaningful basis and retaliatory, effectively robbing Orafidiya of her academic goal to continue matriculating with the Class of 2025.

68. Stated differently, from the onset of Orafidya's difficulties in November 2021, her goals had always been to manage her mental health and matriculate with the Class of 2025. Decisions made by LKSOM administrators made it impossible for her to achieve either of these goals. Orafidiya had no choice but to concede to the final available option that would move her toward her goal of becoming a physician, namely, joining the Class of 2026.

69. After being forced to join the Class of 2026, Orafidiya sought the reasonable accommodation as a student with a disability, requesting that her participation in M1 coursework mirror what would have been the experience had she been allowed to remediate coursework in Summer 2022, namely, sitting for a comprehensive exam without any obligation to attend in-person activities. This request was ultimately denied without explanation. The denial was summary, punitive, and retaliatory.

70. On August 8, 2022, Orafidiya brought her concerns to the attention of Defendant Senior Vice President and Provost Gregory N. Mandel ("Mandel") in an effort to resolve

the matters involving her mistreatment as a disabled student. As Provost, Mandel was presumed to know, at minmum: the elements of ADA and Rehabilitation Act claims; mental disorders such as anxiety, depression, PTSD as recognized impairments under governing statutes, regulations, and case law; the institutional responsibilities to a student who qualifies as disabled, including provision of case-responsive reasonable accommodations; the institutional obligation to seek a reasonable accommodation upon request and to prepare a factual record of conscientious efforts; the need for consultation with treatment providers and staff members who potentially have relevant information; proper consideration of accommodation alternatives rather than regimented adherence to the status quo; the difference between academic judgments and disciplinary decisions; the need for an individualized and objective assessment where a disability claim is made, the evidence of personal animus in disciplinary decision-making; and the presence of retaliatory acts in response to protected activity.

71. Significantly, Mandel was also instrumental in establishing, under the directive of then President Wingard, a university-wide Task Force on Mental Health and Wellness. By announcement dated February 21, 2022, Mandel publicized his view that the mental health and wellness of Temple's stakeholders is "perhaps *the most significant student issue* confronting higher education today[,]" and reflects a "national crisis." The focus of the Task Force is primarily on students, with consideration of how it can also support the university faculty and staff with their own mental health and wellness.

72. Orafidiya's presentation to Mandel was a comprehensive effort, including an exhaustive narrative history of the events with multiple attachments, an event summary, a delineated proposal of remedies, updates containing multiple documents reflecting

Orafidiya's efforts toward resolution with Gusic and Goldberg. Orafidiya also produced a "petition" endorsed by scores of her medical school peers, with an addendum, demonstrating the support of the LKSOM student body. Mandel was fully briefed on the issues relevant to Orafidiya's case.

73. Mandel had the authority to compel everyone involved to meet and resolve the issues raised by Orafidiya. Instead, by separate emails dated September 22 and 23, 2022, Mandel responded to the student petitioners and to Orafidiya, respectively. He was dismissive, stood behind the curtain of confidentiality that Orafidiya had already waived, and left the matter to be resolved by Goldberg, whose judgment and veracity Orafidiya had roundly criticized as a source or her current problems. By his inaction, Mandel effectively endorsed the wrongful treatment by LKSOM administrators that Orafidiya complained of.

74. On October 16, 2022, Orafidiya authorized the filing of a complaint on her behalf by Temple's Office of Equal Opportunity Compliance, for the mistreatment she received from LKSOM administrators, a legally protected activity. When this authorization became known to LKSOM administrators, they undertook the process of intentional and systematic separation of Orafidiya from LKSOM.

75. On Thursday October 27, 2022, Goldberg, emailed the "comprehensive plan" to document the specifications of Orafidiya's return to school. The plan contained no date, no official letterhead, and no signatures, nor did it address all of Orafidiya's documented concerns of administrator misconduct and the subsequent impact that these violations had on her academic progress. Orafidiya expressed her concern that without any *official* document in place to ensure that LKSOM administrators did not violate her procedural

and civil rights, the terms of the proposed agreement could not be confirmed in a later dispute. This inquiry by Orafidiya as to the legitimacy of Goldberg's proposal was protected activity. In response, Goldberg stated that she was "not around" for all of the events that precipitated Orafidiya's problems, a representation that was lacking veracity as it is easily established that Goldberg was announced Interim Dean of LKSOM on April 26, 2021. Goldberg's Goldberg's putative plan was an invalid offer to resolve Orafidiya's matriculation issue.

76. Significantly, there was a substantial omission from Goldberg's proposal that required attention before Orafidiya could proceed, namely, the recognition by Goldberg, Gusic and Cash that they had violated LKSOM's policies regarding student advancement contained in the student handbook. Their first violation was the failure to recognize the provisions of the handbook that applied at the time of Orafidiya's difficulties in 2021 and the prior version, with significant differences related to the availability of remedial examinations and the recordation of failing grades. Orafidiya was subjected to haphazard scheduling and failed administration of remedial examinations. The second violation was the failure to apply the provisions that pertain to Orafidiya's factual circumstance, namely, the resolution of incomplete and failed coursework. In both circumstances, the student is assigned support via an academic advisor/coach or the Assistant Dean for Academic Coaching. LKSOM administrators had multiple opportunities to employ the required assigned support. No such support was arranged for Orafidiya.

77. Third, Goldberg, Gusic and Cash failed to recognize the difference between reasonable accommodations with support and academic discipline; they repeatedly refused Orafidiya the former and held fast to the latter. Had Orafidiya received the

benefit of the terms as detailed in the applicable student handbook, she would have received support, taken the remedial exams as properly scheduled and administered, and would not have failing grades shown on her transcript.

78. In an email published on December 20, 2022, Goldberg wrote to Orafidiya stating that she respected Orafidiya's decision to not return to medical school. The statement and its implications were false, and Goldberg knew of the falsity as she created a narrative that was not factual and published the written document. Orafidiya expended significant time and effort to maintain her medical education and zealously expressed her intentions orally and in numerous written communications, which was well-known to Goldberg.

79. On December 20, 2022, Orafidiya's enrollment status was changed to "DROPPED- NOT REGISTERED" without her knowledge or consent. Orafidiya had not withdrawn from school, nor had she received a letter of dismissal. In addition, on or about January 9, 2023, Orafidiya was removed from the LKSOM student list serve. Again, Orafidiya received no prior notice of this change in status and did not make the change herself. These actions by LKSOM administrators to change Orafidiya's enrollment status without her knowledge and consent were retaliatory.

80. On or about March 8, 2023, Goldberg forwarded a comprehensive plan for Orafidiya's enrollment. The plan entailed the change in class year from 2025 to 2027 to which Orafidiya had not agreed, transcript changes to reflect leave of absence status for the spring 2022 semester when Orafidiya was actually enrolled at LKSOM, a financial plan reflecting additional future monetary obligations that Orafidiya had not

contemplated, and the contents of the anticipated MSPE letter which Orafidiya had reason to question.

81. On March 8, 2023, Dr. Bettina Buttaro ("Buttaro") sent Orafidiya a letter containing her (Buttaro's) narrative interpretation of Goldberg's plan, further confusing the requirements for Orafidiya's re-enrollment to LKSOM. The letter also demanded that Orafidiya respond by 5:00 pm on March 22, 2023.

82. On March 22, 2023, Orafidiya sent her reply, requesting an accommodation of additional time, stating: "I am in receipt of your decision letter from the Academic Standards and Promotions Committee (ASPC) meeting held on February 21, 2023. Due to the complex nature of the attachment, and its resounding impact on my future medical education, I am writing to request additional time to thoroughly review this information before rendering my decision."

83. By letter of March 22, 2023, Buttaro reported that "the ASPC reviewed [Ms Orafidiya's] request and did not approve an extension." Buttaro did not state a procedural or substantive reason for the deadline or the denial of the time extension accommodation.

84. On March 30, 2023, Goldberg issued the letter notifying Orafidiya of dismissal from the medical school, a final decision that was not subject to appeal. The ostensible basis for dismissal was Orafidiya's failure to respond to Goldberg's demand that Orafiya declare her agreement to conditions that would include her acceptance of placement in the class of 2027. This explanation was pretextual. The actual reason for the dismissal was Orafidiya's persistent self-advocacy, her identification of LKSOM administrators who had denied her reasonable accommodations, and her eventual authorization of the

EOC complaint, all of which were protected activities. Orafidiya's dismissal, spearheaded by Gusic, Goldberg, and Cash, was discriminatory and retaliatory.

85. To date, Orafidiya has received no report of investigation or draft complaint from the Temple University Office of Equal Opportunity Compliance.

86. On March 18, 2025, Orafidiya received the determination letter from the HHS Office for Civil Rights that the agency will take no further action.

**COUNT I – DISCRIMINATION BASED ON DISABILITY**
**(42 U.S.C. §§ 12182(a), 12131-12134,; 29 U.S.C. § 794; 43 Pa. Stat. § 953)**
**(All Defendants)**

87. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

88. Orafidiya was at all relevant times otherwise qualified for her position as a medical student and had demonstrated competence for that position.

89. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, all Defendants discriminated against Orafidiya because of her disability in violation of the legal authority cited above.

90. Defendants discriminated against Orafidiya deliberately, and with actual malice, intent to injure, and in willful disregard for her rights, *inter alia*, as follows:

Repeated failure to provide reasonable accommodations in the Fall 2021;

The failure to consult with Dr. Gerald Sterling and other members of Orafidiya's support team; The failure to obtain an individualized objective assessment of Orafidiya's mental health needs;

The failure to articulate an objective basis to deny Orafidiya's mental health crises and need for accommodations;

Treating Orafidiya as if she had no disability in order to preserve the status quo;

The failure to allow the remote participation by ZOOM;

The imposition of their authority rather than make legitimate medical or psychological inquiries as to the most effective means to relieve Orafidiya's mental health symptoms;

On March 15, 2022, Gusic and Cash denied reasonable accommodations, and presented instead Orafidiya's "option" to withdraw from medical school;

On March 15, 2022, Gusic denied reasonable accommodations and declared her intention to take Orafidiya for a disciplinary hearing on March 22, 2022;

LKSOM administration's efforts to elicit Orafidiya's withdrawal from LKSOM or establish grounds for Orafidiya's involuntary dismissal; and

On May 12, 2022, Cash's failure to offer academic coaching or entertain accommodations even though Orafidiya had failed both Systems 1 and Systems 2.

**COUNT II – DISCRIMINATION BASED ON RACE, SEX AND AGE**
**(42 U.S.C. § 2000a; 2000d; 20 U.S.C. §§ 1681-1688; 42 U.S.C. § 1981 (a), (c))**
**(42 U.S.C. §§ 6101-6107; 43 Pa. Stat. § 953)**
**(Gusic; LKSOM; Temple; Trustee Defendants)**

91. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

92. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Gusic discriminated against Orafidiya because of her race, sex and age in violation of the legal authority cited above.

93. Orafdiya identifies as a queer Black woman with a disability. Orafidiya's accommodation requests were modest. She sought modification of course attendance policy, including doubling the number of allowable absences without penalty, extensions of assignment deadlines, extended time for testing administration, testing in a distraction-

reduced environment, and utilization of ZOOM for specific but rare learning activities where other students used remote means. Orafidiya was not a disciplinary challenge, she behaved professionally, and she was not a direct threat.

94. Orafidiya observed that she was treated differently than others, with condescension and contempt, not warranted by her actions, without reason and with actual malice, intent to injure, and in willful disregard for her rights.

**COUNT III – RETALIATION**
**(42 U.S.C. § 12203; 42 U.S.C. § 1983)**
**(All Defendants)**

95. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

96. Orafidiya was at all relevant times otherwise qualified for her position as a medical student and had demonstrated competence for that position.

97. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Defendants Goldberg, Gusic, Cash, LKSOM, Temple and the Trustee Defendants retaliated against Orafidiya, *inter alia*, as follows:

Dismissed Orafidiya from LKSOM, after making a record of her involvement in protected activity;

Threatened Orafidiya with severe consequences;

Referred Orafidiya for disciplinary action;

Threatened Orafidiya with academic discipline;

Labeled Orafiya as "unprofessional;"

Threatened to refer Orafidiya for academic discipline on the eve of a Systems 3 final exam;

Failure to allow Orafidiya to take make-up exams;

Refusal to add Orafidiya's case to the agenda of SLEAC;

Took actions to render the LKSOM environment unbearable that would force Orafidiya to resign from LKSOM;

Attempted to suppress Orafidiya's self-advocacy, in exercise of her First Amendment right to free speech; and

Tried to suppress Orafidiya's expressed desire to remain in medical school, in exercise of her First Amendment right to free speech.

98. Defendants dismissed Orafidiya deliberately, and with actual malice, intent to injure, and in willful disregard for her rights.

**COUNT IV – MISREPRESENTATION**
**(Cash; LKSOM; Temple; Trustee Defendants)**

99. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

100. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Defendants Cash, LKSOM, Temple, and the Trustee Defendants misrepresented material facts against Orafidiya, *inter alia*, as follows:

101. LKSOM administrators failed to schedule the Fundamentals 3 examination per the arranged schedule in January 2022. Notwithstanding Orafidiya's readiness to take the exam, LKSOM administrators forced a 7-month continuation of the examination to July 2022. Rather than acknowledge the error and reschedule the exam for a time nearer to Orafidiya's preparation, LKSOM administrators failed to do so, then intentionally falsified the justification for that remedy by *misrepresenting* Orafidiya's position. The contention that Orafidiya *requested* that the Fundamentals 3 examination be postponed

was a misrepresentation of a material fact by Cash. Cash embellished the coverup by also contending, falsely, that Orafidiya lacked professionalism and was not prepared for the exam. There exists no evidence to support either contention.

102. Defendants Cash, LKSOM, Temple, and the Trustee Defendants are responsible for these wrongful representations made to force Orafidiya to withdraw from LKSOM, with actual malice, intent to injure, and in willful disregard for her rights.

**COUNT V – DEFAMATION**
**(Cash; Goldberg; LKSOM; Temple)**

103. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

104. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Defendants Cash and Goldberg published false and defamatory accusations about Orafidiya's work performance and adherence to workplace policies as detailed herein, knowing those accusations were false, or with reckless disregard for the truth, and with malice, causing Orafidiya to suffer actual injury.

105. When LKSOM administrators failed to schedule and administer a final exam and rescheduled the exam date for seven months later, rather than acknowledge the error and reschedule the exam for a time nearer to Orafidiya's preparation, LKSOM administrators failed to do so, then intentionally falsified the justification for that outcome by *misrepresenting* Orafidiya's position. The contention that Orafidiya *requested* that the Fundamentals 3 examination be postponed was a misrepresentation of a material fact by Cash. Cash embellished the coverup by also contending, falsely, that Orafidiya lacked professionalism and was not prepared for the exam.

106. In an email published on December 20, 2022, Goldberg wrote to Orafidiya stating that she respected Orafidiya's decision to not return to medical school. The statement and its implications were false, and Goldberg knew of the falsity as she created a narrative that was not factual and published the written document.

107. Defendants Cash, Goldberg, LKSOM and Temple are responsible for defaming Orafidiya with malice, ill will, and deliberate intent to cause her harm.

**COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Goldberg; Gusic; Cash; LKSOM; Temple; Trustee Defendants)**

108. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

109. Due to the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Defendants Goldberg, Gusic, Cash, LKSOM Temple and the Trustee Defendantsindividually and collectively, engaged in extreme and outrageous conduct intended to cause Orafidiya emotional distress, or Defendants acted with reckless disregard whether the conduct would cause Orafidiya to suffer emotional distress. Defendants' conduct is identified in the previous allegations and paragraphs and includes, but is not limited to: Gusic's repeated failure to provide accommodations without justification for the denials;

Gusic's punitive response to Orafidiya's requests for accommodations;

Gusic's, Goldberg's and Cash's individual and collective efforts to force Orafidiya's withdrawal from LKSOM;

Gusic's, Goldberg's and Cash's individual and collective efforts to force Orafidiya to carry 2 incomplete grades pending her taking and passing a joint remediation examination, knowing that this plan carried a low likelihood of success;

LKSOM administration's representation that there was no need for Orafidiya to be concerned about the success of plan involving the joint remediation exam for summer 2022;

Gusic' repeated threats of disciplinary action; and

Goldberg's and Cash's false representations concerning Orafidiya's intentions to remain in school and that Orafidiya was not professional.

110. Defendants' actions were extreme and outrageous, with the intent to cause Orafidiya severe emotional distress, or with reckless disregard for her rights.

**COUNT VII – BREACH OF CONTRACT**
**(All Defendants)**

111. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

112. Due to the actions taken by its principals, owners, alter egos, officers, agents, servants, employees, or contract entities, Defendant LKSOM and Temple published and disseminated the Student and Faculty Handbook for the MD Education Program. Given its delineation of standards of conduct, rules for personal conduct, specifications for grading discipline and termination, this document, and other material published by LKSOM and Temple, legally operates as a contract between LKSOM's students, the medical school and the university. Orafidiya acted in compliance with the terms set forth in the Handbook.

113. LKSOM, Temple, Goldberg, Gusic and Cash breached terms of the contract with Orafidiya, *inter alia*, as follows:

Failure to refer Orafidiya to an Academic Coach after one incomplete grade;

Failure to refer Orafidiya to the Assistant Dean of Academic Coaching after two incomplete grades;

Failure of the Senior Associate Dean of Education to provide support to Orafidiya in November 2021;

Failure to refer Orafidiya to an Academic Coach or to the Senior Associate Dean of Education following Orafidiya's block (2) failures;

Failure to provide resolution of conflicts in the applicable student handbook and its predecessor;

The initiation of multiple referrals to the Academic Standards and Promotion Committee, which evaluates but does not support a student;

Failure to properly schedule and administer a remediation examination;

Failure to follow the student handbook provisions regarding repeat coursework; and

Failure to follow the student handbook provisions regarding incomplete coursework.

114. In addition, there were other agreements with Orafidiya that were individually and collectively breached by Defendants when they dismissed her without valid cause, retaliated against her and, failed to comply with their own policies and procedures.

Gusic breached the agreement entered January 2, 2021 regarding Orafidia's return to school;

Gusic failed to adhere to the plan that did not require another orientation and repeat of Doctoring I;

The failure to prepare and administer the Fundamentals 3 final exam;

The failure to adhere to policies governing ASPC hearings; and

Modification of agreements with Orafidiya without her consent.

**COUNT VIII – NEGLIGENCE**
**(All Defendants)**

115. Plaintiff adopts and incorporates by reference all previous allegations as though fully set forth herein.

116. Defendants, individually and collectively, had a duty to use reasonable care to select employees who are fit to perform the work assigned to them. Defendants, through the actions taken by their principals, owners, alter egos, officers, agents, servants, employees, or contract entities against Orafidiya as described in the foregoing paragraphs and allegations, breached the duty owed to Orafidiya that those who Defendants selected, trained, retained, supervised or otherwise controlled would cause no harm to Orafidiya. Defendants knew or should have known that those who Defendants selected, trained, retained, supervised, or otherwise controlled behaved in an unfit or incompetent manner, and armed with that actual or constructive knowledge, Defendants failed to provide adequate training and supervision.

117. Defendants Temple, LKSOM, Wingard, Mandel and Goldberg, individually and collectively, had a duty to use reasonable care to: select staff who were fit to supervise, investigate, provide notice of investigative findings to, and make proper decisions regarding any discipline of Orafidiya; and maintain a work environment for Orafidiya that was free of discrimination, harassment, and intimidation. Defendants breached this duty of reasonable care, resulting in injury to Orafidiya.

118. In addition, Defendants breached their individual and collective duties to Orafidiya, as follows:

The failure to consult with treatment providers and knowledgeable staff in creation of a plan for Orafidiya's successful attendance at and completion of medical school;

The failure to perform an individualized inquiry and assessment of Orafidiya's mental health needs in light of her requests for accommodations;

The failure to weigh alternative and options for accommodations of Orafidiya's disability;

The failure to prepare and administer the Fundamentals 3 Final Exam; and

The failure to recognize or appreciate the catastrophic consequences of the poorly conceived and executed plans for Orafidiya's return to medical school;

The failure to recognize, appreciate or follow LKSOM's policies concerning student support and promotion.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Orayinka Orafidiya seeks a judgment in her favor and against all Defendants, and further requests that the Court:

Find and declare that all Defendants discriminated against Orafidiya on the basis of disability in violation of 42 U.S.C. §§ 12182(a), 12131-12134; 29 U.S.C. § 794; 43 Pa. Stat. § 953;

Find and declare that all Defendants discriminated against Orafidiya on the basis of race, gender and age in violation of 42 U.S.C. § 2000a; 2000d; 20 U.S.C. C 1681-1688; 42 U.S.C. § 1981 (a), (c); 42 U.S.C. §§ 6101-6107; 29 U.S.C. §§ 621-634; 43 Pa. Stat. § 953;

Find and declare that all Defendants retaliated against Orafidiya in violation 42 U.S.C. § 12203; 42 U.S.C. § 1983;

Find and declare that Defendants Cash, LKSOM, Temple, and Trustee Defendants are liable to Orafidiya for misrepresentation, in violation of Pennsylvania common law;

Find and declare that Defendants Cash, Goldberg, LKSOM, Temple, and Trustee Defendants are liable to Orafidiya for defamation in violation of Pennsylvania common law;

Find and declare that Defendants Goldberg, Gusic, Cash, LKSOM, Temple and Trustee Defendants acted intentionally to cause Orafidiya emotional distress in violation of Pennsylvania common law;

Find and declare that all Defendants breached their respective contracts with Orafidiya in violation of Pennsylvania common law;

Find and declare that all Defendants breached their respective duties of care to Orafidiya in violation of Pennsylvania law;

Declare all Defendants in violation of the Pennsylvania Human Relations Act, 43 Pa. Stat. §§ 951-963;

Order Defendants to expunge any and all disciplinary records from Orafidiya's student file and any other LKSOM or Temple documents;

Order Defendants to expunge any and all failing grades from Orafidiya's student file and any other LKSOM or Temple documents;

Order Defendants to expunge any and all records of dismissal from Orafidiya's student file and any other LKSOM or Temple documents;

Order Defendants to pay direct and indirect damages to Orafidiya in an amount to be determined at trial;

Order that Orafidiya be awarded punitive damages in an amount to be determined at trial;

Award Orafidiya costs and disbursements of this action, including reasonable attorneys' fees; and

Grant such other and further relief the Court deems equitable, just, and proper.

**JURY TRIAL DEMAND**

Plaintiff Orayinka Orafidiya seeks a trial by jury as to all claims against all Defendants.

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ *Orayinka Orafidiya*
ORAYINKA ORAFIDIYA

This Complaint of Orayinka Orafidiya and Jury Trial Demand are respectfully submitted on the 28th day of March 2025.

/s/ *Orayinka Orafidiya*
ORAYINKA ORAFIDIYA
7300 Cresheim Road.
Suite C9
Philadelphia, Pennsylvania 19119
(215) 681-07978
yinka.orafidiya@gmail.com